ST. MARY'S HOSPITAL, DECATUR, of the Hospital Sisters of the Third Order of St. Francis, Plaintiff-Appellant v. HEALTH PERSONNEL OPTIONS CORPORATION, Defendant-Appellee (Seth Randle, Defendant).

Fourth District   No. 4—99—0194

Argued October 19, 1999.—Opinion filed December 16, 1999.

Bradley E. Huff (argued), of Graham & Graham, Ltd., of Springfield, for appellant.

Julie A. Ward, Matthew B. Smith, and Laura A. Sallmann, all of Quinn, Johnston, Henderson & Pretorius, Chartered, of Peoria, for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

A patient filed suit against St. Mary's Hospital (St. Mary's) for medical malpractice because a sponge was left in her abdomen after surgery. Summary judgment was entered against the hospital; the parties then reached a settlement. St. Mary's subsequently filed suit against Health Personnel Options Corporation (HPO), alleging breach of contract and implied indemnity because one of HPO's temporary nurses participated in the surgery from which the underlying suit arose. The trial court once again entered a summary judgment against St. Mary's, asserting that (1) St. Mary's failed to demonstrate that HPO breached its contract by providing St. Mary's with an unqualified nurse, and (2) St. Mary's could not maintain an implied indemnity action against HPO because the release St. Mary's entered into with the patient failed to extinguish HPO's liability. We affirm.

## I. BACKGROUND

In August 1991, St. Mary's entered into a one-year contract with HPO to fill supplemental staffing needs at St. Mary's. Pursuant to the terms of the contract, HPO agreed to "put forth its most diligent efforts to provide qualified personnel." The specific terms of the contract required the following of HPO:

"5. Provide personnel to fill specific positions;

6. Provide St. Mary's with a completed application, resume if available, skills checklist and references for each employee prior to his first day of employment;

7. Verify that each employee has a minimum of one year [of] recent experience;

8. Verify valid state licensure;

9. [Rea]ssign or dismiss any employee upon documentation from St. Mary's of unsatisfactory performance or conduct; and,

10. Employ and compensate all personnel that have been accepted for a position by St. Mary's, and maintain responsibility for all necessary federal and state taxes, workers['] compensation insurance, professional liability insurance, and unemployment insurance for each employee."

In September 1991, HPO referred Seth Randle to St. Mary's to fill the position of surgical nurse. Consistent with the terms of the contract, HPO provided St. Mary's with (1) Randle's completed application for employment, a skills checklist, and references; (2) verification that Randle had one year of experience; and (3) verification that Randle's registered nurse license was valid. HPO also procured professional liability insurance for Randle. St. Mary's accepted Randle's assignment and instructed Randle on hospital policies and procedures, including sponge-, needle-, and instrument-counting procedures. Randle worked at St. Mary's from September 1991 until February 1992, for a total of 21 weeks.

In January 1992, a sponge was accidentally left in a patient during surgery while Randle was serving as a "circulating nurse." Although the sponge was eventually discovered and removed in June 1992, by that time Randle no longer worked at St. Mary's or for HPO. In addition, HPO's one-year contract with St. Mary's was due to expire in three months.

In January 1994, the patient filed a medical malpractice suit against St. Mary's, the surgeon who performed the procedure, and the radiologist who allegedly failed to discover the sponge. The complaint against St. Mary's specifically alleged that St. Mary's created an unreasonable and foreseeable risk of harm to the patient when it:

"A) Failed to adequately supervise [p]laintiff's treatment;

B) Failed to properly count surgical sponges before their use by physicians and/or physician's assistants;

C) Caused to be placed a laparotomy sponge in the [p]laintiff which was not removed properly;

D) Failed to remove the laparotomy sponge from the [p]laintiff at the conclusion of the surgical procedure;

E) Failed to properly count sponges after their use by physicians and/or physician's assistants;

F) Failed to properly supervise the surgical sponge count;

G) Failed to diagnose that the [p]laintiff had a foreign body left after the surgical procedure by misreading the [p]laintiff's [X ]ray; and

H) Failed to perform or order the performance of additional tests to discover retained foreign bodies placed in [p]laintiff during the surgical procedure."

The patient did not sue nurse Randle or HPO, however, and St. Mary's did not file a third-party complaint. Therefore, Randle and HPO were not parties in the underlying suit.

In August 1995, the trial court granted the patient's motion for summary judgment against St. Mary's, but denied the patient's motions for summary judgment against the surgeon and radiologist. By November 1995, St. Mary's completed its settlement negotiations with the patient, and the trial court entered a finding of good faith as to the settlement. The settlement agreement and release expressly stated that although St. Mary's admitted no responsibility or liability for the patient's injuries, in consideration for $346,915, the patient would "release and discharge ST. MARY'S HOSPITAL, DECATUR, OF THE HOSPITAL SISTERS OF THE THIRD ORDER OF ST. FRANCIS, Decatur, Illinois, an Illinois not-for-profit corporation, from any and all claims, demands, actions[,] and rights of action of whatsoever kind, nature[,] or description growing out of occurrences while a patient in the said hospital." The release also asserted that St. Mary's retained its right to pursue various remedies against Randle and HPO. However, the release did not explicitly release Randle or HPO from liability.

In January 1996, St. Mary's filed a suit against Randle for implied indemnity but then voluntarily dismissed the suit because St. Mary's had previously been unable to secure Randle's presence for a deposition and was unable to serve Randle with the complaint. St. Mary's also filed suit against HPO for breach of contract and implied indemnity. In response, HPO filed a motion for summary judgment.

In August 1998, the trial court granted HPO's motion for summary judgment against St. Mary's. The trial court specifically found that St. Mary's had "to come forward with some evidence to show that the [d]efendant breached its contract by providing an unqualified nurse," and no such opinions were presented "on the broad issue of whether or not Mr. Randle was unqualified as a person to be provided to St. Mary's under the contract." The court further reasoned that "the fact that Mr. Randle was negligent on one occasion doesn't make him an unqualified employee."

In addition, the court held that "because of the nature of the release itself, there can be no implied indemnity [because] [HPO] was not released from liability to the injured patient and beyond that, *** we don't have implied indemnity when we [are] talking about [two] parties who only have vicarious liability in a relationship."

In September 1998, St. Mary's filed a motion to supplement the record and a motion to reconsider. In November 1998, a hearing was held on the motions. In February 1999, the trial court denied both motions. This appeal followed.

## II. ANALYSIS

■ As in all cases involving summary judgment, we conduct a *de novo* review of evidence in the record. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992). When evaluating the propriety of granting summary judgment, the trial court should construe pleadings, depositions, admissions, exhibits, and affidavits strictly against the movant and liberally in favor of the respondent. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323, 1326 (1995); *Golla v. General Motors Corp.*, 261 Ill. App. 3d 143, 146, 633 N.E.2d 193, 196 (1994). Summary judgment is appropriate when no genuine issue of material fact exists and the moving party's right to judgment is clear and free from doubt. *In re Estate of Hoover*, 155 Ill. 2d 402, 410, 615 N.E.2d 736, 739 (1993). Although summary judgment is encouraged to aid the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 518, 622 N.E.2d 788, 792 (1993). Therefore, where reasonable persons could draw divergent inferences from the undisputed material facts or where a dispute exists as to a material fact, summary judgment should be denied and the issue decided by the trier of fact. *Espinoza*, 165 Ill. 2d at 114, 649 N.E.2d at 1326. In short, our function in reviewing a grant of summary judgment is to determine whether the trial court correctly found that no genuine issues of material fact existed and, if so, whether the trial court correctly entered judgment as a matter of law. *Rockford Memorial Hospital v. Department of Human Rights*, 272 Ill. App. 3d 751, 754, 651 N.E.2d 649, 653 (1995).

### A. Breach of Contract

St. Mary's asserts that the trial court erroneously found as a matter of law that Randle's alleged negligence and failure to cooperate in the underlying suit did not breach HPO's contractual obligation to provide "qualified" personnel or HPO's implied duty of good faith and fair dealing. We disagree.

■ HPO entered into a contractual agreement with St. Mary's to "put forth its most diligent efforts to provide qualified personnel." The contract identified specific minimum qualifications that the personnel must possess. When Randle was referred to St. Mary's, he undisputedly possessed the contractually required minimum qualifications of a valid license and one year of recent experience. Although a

genuine issue of material fact appeared to exist as to whether Randle acted negligently in the underlying suit, not one deposed witness alleged that Randle was unqualified. Therefore, even when construing the pleadings, depositions, admissions, exhibits, and affidavits strictly against HPO and liberally in favor of St. Mary's, no genuine issue of material fact existed that Randle was unqualified pursuant to the contract, and HPO's right to summary judgment is clear.

St. Mary's argues, however, that Randle's and HPO's failure to cooperate and assist in the defense of the underlying suit are facts that demonstrate HPO breached its implied contractual duty of good faith and fair dealing and are relevant to St. Mary's claim that HPO failed to provide a qualified nurse. Once again, we disagree.

Every contract contains an implied promise of good faith and fair dealing between the contracting parties. *Spircoff v. Spircoff*, 74 Ill. App. 3d 119, 127, 392 N.E.2d 363, 369 (1979); *Perez v. Citicorp Mortgage, Inc.*, 301 Ill. App. 3d 413, 423, 703 N.E.2d 518, 525 (1998). Therefore, even though the express words are absent, a court will compel performance in accordance with what it believes to be required by good faith and fair dealing. *Spircoff*, 74 Ill. App. 3d at 128, 392 N.E.2d at 369. The implied obligations of good faith and fair dealing, however, are only a derivative principle of contract law used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions. *Perez*, 301 Ill. App. 3d at 423-24, 703 N.E.2d at 525. Therefore, notwithstanding these implied covenants, parties are still entitled to enforce the terms of negotiated contracts to the letter without being penalized for lack of good faith. *Perez*, 301 Ill. App. 3d at 424, 703 N.E.2d at 525. In addition, the principles of good faith and fair dealing generally do not apply after the termination of the relationship. *Prudential Insurance Co. of America v. McCurry*, 143 Ill. App. 3d 222, 226, 492 N.E.2d 1026, 1028 (1986).

The record reveals that Randle left St. Mary's and terminated his employment at HPO one month prior to the sponge being discovered. The record further reveals that the patient did not file a complaint in the underlying suit against St. Mary's until over a year after HPO's contract had expired and almost two years after Randle had quit HPO. In addition, when St. Mary's did contact HPO about the underlying suit, HPO forwarded the information on to the insurance carrier that HPO had procured for Randle consistent with its obligations under the contract. Consequently, HPO met its duty of good faith and fair dealing, as well as its express obligation under its contract with St. Mary's, when it procured professional liability insurance for Randle and submitted all information related to the underlying suit to Randle's insurance carrier.

HPO had no express independent contractual duty or implied contractual duty to assist in the defense of the underlying suit as a matter of law. In addition, St. Mary's cites no legal authority for the proposition that HPO should be held directly or vicariously liable for the uncooperative behaviors of an ex-employee when those behaviors occurred substantially after the employment relationship had been terminated.

Accordingly, because no genuine issue of material fact exists that (1) HPO provided a qualified person pursuant to its contract with St. Mary's, and (2) HPO did not breach its implied duty of good faith and fair dealing, we affirm the trial court's award of summary judgment in favor of HPO and against St. Mary's.

## B. Implied Indemnity

St. Mary's asserts that the trial court improperly found as a matter of law that it was not entitled to quasi-contractual implied indemnity from HPO because St. Mary's was a blameless principal that was vicariously liable for the actions of an agent. St. Mary's further argues that the express language in the settlement and release agreement between St. Mary's and the patient was "not intended to preserve in favor of [the patient] a claim against HPO or Seth Randle, even though neither Seth Randle nor HPO was specifically named in the [r]elease." Because the latter issue is outcome determinative, we will address that issue first.

Any settlement between an agent and a plaintiff in a quasi-contractual context must also extinguish the principal's vicarious liability. Therefore, to the extent that the principal's potential liability is solely derivative, the principal should be dismissed from the action. *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 154 Ill. 2d 347, 355, 609 N.E.2d 285, 289-90 (1992). Settlements between the principal and a plaintiff, however, merit different consideration. Settlements between the principal and a plaintiff have the effect of creating, in the blameless principal, an interest indistinguishable from the contribution interest of other tortfeasors at fault in fact. Therefore, the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 *et seq.* (West 1998)) should apply to these agreements. *American National Bank*, 154 Ill. 2d at 355, 609 N.E.2d at 290. "The release of the agent from liability to the plaintiff, as well as preservation of the principal's implied indemnity claim, depends, then, on the agent's being named in the settlement." *American National Bank*, 154 Ill. 2d at 355, 609 N.E.2d at 290. The use of the word "agent" by itself is insufficient to extinguish the agent's liability to the plaintiff. See *Stro-Wold Farms v. Finnell*, 211 Ill. App. 3d 113, 116, 569 N.E.2d 1156, 1158 (1991).

The settlement and release agreement entered into between the patient and St. Mary's did not explicitly release either Randle or HPO from liability to the patient in the underlying suit. St. Mary's even acknowledged this shortcoming during the July 1998 hearing on HPO's motion for summary judgment:

"THE COURT: Is the hospital contending that its[ ] release is a global release of all claims? Claims against Randle, claims against [HPO]? Is that what your suggestion is?

MR. HUFF [(Attorney for St. Mary's)]: No. I don't think we'd go that far, your honor."

During the hearing on St. Mary's motion to reconsider in November 1998, St. Mary's once again acknowledged that the release did not explicitly name Randle or HPO, but offered the following explanation for the omission:

"MR. HUFF: The wording of the release was very deliberate. Uh—I know that I consult with other lawyers in my office. I know that I consult with my client. Given the status of the case, [s]ummary [j]udgment against us; yet, not the physicians; the case still proceeding against them; inability to get hold of Seth Randle; not knowing where it would lead. We wanted to have narrowly tailored the release.

One of the fears is in the Contribution Act which, of course, is how we start out in this case. Motions to dismiss from HPO, that, [']Wait a minute, Judge. This is not appropriate action to bring.['] Really, the [h]ospital is limited to a contribution action. One of the fears, when we wrote the release, was that if we said, specifically, Seth Randle, and, specifically, HPO are released, they would then, of course, point the [c]ourt to the Contribution Act [(740 ILCS 100/ 2(c), (d), (West 1998))], talking where it says the [c]ourt fees or who settles with a claimant pursuant to [p]aragraph [(c)], which is a release which we have, is discharged from all liability for any contribution [of] any other tortfeasor."

▪ The record reveals that St. Mary's purposefully crafted the release so that Randle and HPO would not be released from liability because St. Mary's erroneously believed that it could avoid the restrictions of the Contribution Act. However, this purposeful act not only precluded St. Mary's from seeking contribution from Randle and HPO in the initial suit under the Contribution Act, it precluded St. Mary's from pursuing its indemnity claim as well.

*American National Bank* found that the Contribution Act applied to settlements between a blameless principal and a plaintiff because these settlements created an interest indistinguishable from the contribution interests of other tortfeasors at fault in fact. (Conversely, where the plaintiff settles with the agent for a portion of the claim,

reserving the right to sue the principal, the principal's common-law right to seek indemnity from the agent is not abolished by the Contribution Act). *American National Bank*, 154 Ill. 2d at 355, 609 N.E.2d at 290. Section 5 of the Contribution Act (740 ILCS 100/5 (West 1998)) requires a party seeking contribution to assert a counterclaim or a third-party claim if a pending action exists. See *Laue v. Leifheit*, 105 Ill. 2d 191, 196, 473 N.E.2d 939, 941-42 (1984). St. Mary's did not file either a counterclaim or third-party action against HPO while the initial suit was pending.

In addition, a tortfeasor who settles with a claimant is not entitled to recover contribution from another tortfeasor whose liability is not extinguished by the settlement (740 ILCS 100/2(e) (West 1998)). St. Mary's failed to extinguish either Randle's or HPO's liability to the plaintiff in the settlement of the original suit. Therefore, St. Mary's was barred from seeking contribution or implied indemnity against HPO because St. Mary's failed to either (1) join HPO in the original suit or (2) extinguish HPO's liability to the plaintiff in the settlement.

Accordingly, because no genuine issues remained as to any material fact, the trial court correctly entered judgment against St. Mary's.

### III. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

COOK, P.J., and KNECHT, J., concur.